## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**URALLE PRICE**                                          **CIVIL ACTION**

**VERSUS**                                                **NO. 06-2444**

**BURL CAIN, WARDEN**                                     **SECTION "I" (6)**

### <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.

Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2). Accordingly, it is recommended that the petition be **DENIED WITH PREJUDICE.**

## I.  PROCEDURAL HISTORY[1]

Petitioner, Uralle Price, is a prisoner presently incarcerated in the Louisiana State Penitentiary, located in Angola, Louisiana.  On December 8, 1999, petitioner, along with co-defendant, David Honore, was charged by grand jury indictment with the first degree murder of Rickey Thomas, in violation of La. R.S. 14:30.  Both pleaded not guilty at their January 5, 2000 arraignment.  On January 31, 2000, following a sanity hearing, the trial court found defendant Honore in need of psychiatric treatment.  The State amended the indictment on March 28, 2000 to charge both defendants with second degree murder.  On April 10, 2000, following a second sanity hearing, the trial court determined that defendant Honore continued to need psychiatric treatment.  On that same date the trial court denied defendant, Price's, motion to suppress the identification.  On May 1, 2000, following a third sanity hearing, defendant Honore was found competent to proceed.  On that same date both defendants pleaded not guilty to the amended indictment.  On December 18, 2000, at the conclusion of a four-day trial, a twelve-person jury found both defendants guilty as charged.  On August 7, 2001, the trial court denied defendants' respective motions for new trial.  Defendants waived all legal delays and were each sentenced to life imprisonment at hard labor, without benefit of parole or probation.  On April 2, 2003, the Louisiana Fourth Circuit Court of Appeal affirmed both defendants'

---

[1]A portion of the procedural history was taken from the Louisiana Fourth Circuit Court of Appeal's decision, *State v. Price,* 842 So.2d 491, 495 (La. App. 4 Cir. 2003).

convictions and sentences.  *State v. Price*, 842 So.2d 491 (La. App. 4 Cir. 2003).  On

December 12, 2003, the Louisiana Supreme Court denied petitioner's writ application,

thereby rendering his conviction and sentence final.  *State v. Price*, 860 So.2d 1151 (La.

2003).

On December 7, 2004, petitioner filed with the state district court an

application for post-conviction relief.[2]  Petitioner's efforts in this regard culminated on

January 9, 2006, when the Louisiana Supreme Court denied his writ application.  *State v.

Price*, 918 So.2d 1038 (La. 2006).

On April 11, 2006, petitioner signed the instant federal habeas corpus

action, arguing: 1) The prosecutor made an improper reference to petitioner's invocation

of his right to remain silent; 2) the trial court erred in its response to the jury's inquiry

regarding the meaning of "reasonable doubt"; 3) the trial court erred in denying

petitioner's challenges for cause of William Justi and Stephanie Saizan; 4) the petitioner

was denied effective assistance of counsel; 5) the petitioner's conviction was based upon

insufficient evidence; 6) the prosecution unconstitutionally withheld favorable evidence

from the defense; and, 7) the trial court erred in sending the toxicology report to the jury

during its deliberations.[3]  The State, in its response (rec. doc. 7), does not contend that

---

[2]*See* Federal rec., doc. 1-3 at p. 10; *see also* doc. 7 at p. 2.

[3]*See* Federal rec., doc. 1-3 at p. 18.

petitioner has failed to exhaust his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982).  The State does, however, argue that petitioner's habeas application should be dismissed as time-barred.  For the following reasons, this court disagrees.

## II.  TIMELINESS

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a petitioner is required to bring his habeas corpus claims pursuant to 28 U.S.C. § 2254 within one year from "the latest of -"

> **(A)** the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> **(B)** the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> **(C)** the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> **(D)** the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. §2244(d)(1) (West 2008).

In the instant matter, petitioner's conviction became final on December 12, 2003, and his time for seeking review expired on March 13, 2004, 90 days following his

final state court judgment, when his time for filing a petition for a writ of certiorari with the United States Supreme Court expired.  *See* Sup.Ct.R. 13(1); *see also Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999), *cert. denied*, 529 U.S. 1099, 120 S.Ct. 1834, 146 L.Ed.2d 777 (2000).  Thus, petitioner had a year from March 13, 2004, or until March 13, 2005, to timely seek federal habeas corpus relief.

Petitioner signed the instant habeas action on April 11, 2006, over a year after his March 13, 2005 deadline.  Thus, petitioner's federal habeas corpus application must be dismissed as untimely unless the one-year statute of limitations period was interrupted as set forth in 28 U.S.C. § 2244(d)(2).  Under that statutory provision, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."

Petitioner filed his first state post-conviction application on December 7, 2004, at which point, he had approximately three months remaining of his one-year prescriptive period.  The State concedes that petitioner's first post-conviction application remained pending and continued to toll prescription until January 9, 2006, when the Louisiana Supreme Court denied his writ application.  *Price*, 918 So.2d 1038.[4]  The State further concedes that because prescription was tolled during the time period from

_____

[4]*See* Federal rec., doc. 7 at p. 5.

December 7, 2004 to January 9, 2006, petitioner's deadline for timely filing a federal habeas corpus application was April 13, 2006.[5]  Thus, if April 11, 2006, the date petitioner signed his federal habeas corpus application, is considered the date he filed it, then the instant action is timely.

Under the "prison mailbox rule", a pleading submitted by a prisoner acting *pro se* is considered to be filed for prescriptive purposes on the date it is delivered to prison officials for mailing, rather than the date it is received by the court. *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  Generally, the date a prisoner signs his pleading is presumed to be the date he delivered it to prison officials for mailing. *See Colarte v. Leblanc*, 40 F.Supp.2d 816, 817 (E.D. La. 1999) (assumed that petitioner turned his pleading over to prison officials for delivery to this court on the date he signed it).  The State, however, contests the above presumption, arguing that petitioner has the burden of providing the court with "[s]ome confirmation" of the date he delivered his habeas application to prison officials for mailing, but the State fails to cite any case law to support its argument.[6]  This court's research has likewise uncovered no cases rejecting the above-described presumption in favor of a requirement that a prisoner, for purposes of determining the timeliness of his habeas petition, submit "confirmation" of the date he delivered his petition to prison officials for mailing.  Therefore, April 11, 2006, shall

---

[5]*See* Federal rec., doc. 7 at p. 5.

[6]*See* Federal rec., doc. 7 at p. 6.

properly be considered the filing date of petitioner's habeas application and, as such, the

instant action was timely filed.  Accordingly, this court shall proceed to address the merits

of petitioner's claims after setting forth the pertinent facts and applicable standard of

review.

### III.  FACTS[7]

Felicia Varnado, twenty-one years old at the time of trial, testified that she

had known defendant Uralle "Tully" Price since she was six or seven years old, from the

lower Ninth Ward neighborhood where she used to live.  She went to elementary and high

school with him.  Varnado also knew defendant David Honore from the neighborhood,

and had dated him for six and one-half years.  Rickey Thomas, the victim, was her

boyfriend at the time he was murdered.  Varnado replied in the negative when asked

whether she had any reason to testify falsely against either defendant.  Varnado stated that

defendant Honore knew she dated the victim.  Honore kept trying to get her to resume

their relationship.  He later threatened her, saying that he would kill himself, kill her and

kill Rickey Thomas.  Varnado drove a red Dodge/Plymouth Neon, which she identified in

photographs.  On November 10, 1999, at approximately 7:30 or 8:00 p.m., she took some

food to Rickey Thomas at the post office, where he worked.  She talked to him later on

---

[7]The facts are taken from the Louisiana Fourth Circuit's opinion on direct appeal, *Price*, 842
So.2d at 495-505.

the telephone, and picked him up when he got off work.  She had her cousin in the car.
She took Rickey Thomas home, dropped her cousin off, then went home herself.

Varnado talked to Thomas on the telephone for up to an hour, and then
went to Wal-Mart.  She arrived back at her home, located at Caffin Avenue and Dauphine
Street, gathered her bags, and started to exit her car.  Defendants Honore and Price
suddenly appeared, with guns.  Honore was calling her bi* * * and telling her to get the f*
* * over as she screamed and hollered.  Price cocked his shotgun, called her b* * * *, and
told her to shut up.  She confirmed that they had masks on, and were attempting to
disguise their voices.  They told her they wanted the dope and the money from her
boyfriend.  She offered them $600 her cousin had just repaid her for school related
expenses, and her jewelry.  Price slapped the money away.  They drove her to the river
and got out and talked.  Price was saying just kill the b* * * *.  They forced her to show
them exactly where Rickey Thomas lived.

Varnado said that when they got to the victim's apartment, Price's "towel"
had fallen below his nose and she could see that it was in fact Price.  She said there is no
doubt in her mind that it was Uralle "Tully" Price.  Varnado said Price had rubbed stuff in
her eyes while at the river, and at the apartment he rubbed pepper spray in her eyes.
Honore pulled her out of the car, put his pistol in her back, forced her up the stairs of the
victim's apartment complex, and made her knock on the door of the victim's apartment.

8

Honore spoke in his regular voice at this time, which she recognized.  She said Price did

most of the talking, and that when Honore had talked earlier he spoke with an accent.

She never saw Honore's face, but knew it was him because of his voice, his mouth, his

build, the way he walked, "everything" about him.

Varnado said the victim opened the door when she knocked on it.  Honore

came from behind her and the victim fought with him.  Honore shot the victim in the side

and the victim fell to the ground.  Price ran up the stairs and shot the victim "some more"

with the shotgun, and Honore shot him after that.  Varnado said she ran downstairs

screaming and hollering and knocking on doors.  She ran across the street to the police

substation and knocked on the door, then came back and telephoned police.  A male came

up and took the telephone from her.  Honore and Price drove off in her car.  Varnado said

she had no doubt that Honore shot the victim with a pistol and that Price shot him with a

shotgun.  She said the victim had no weapon.  Varnado admitted that when first asked by

police she was afraid to tell them who did it.  She denied involvement with drugs, and

said she used to be employed by the U.S. Postal Service, where the victim was employed

at the time of his death, and that they had to undergo drug tests.  When presented with

crime scene photographs, Varnado at first said she could not look at them.  The trial court

told her she had to, and she did.  She identified the photos as depicting the victim and the

scene.  She said the victim was shot outside of his apartment, and that Honore and Price never attempted to enter it.

Felicia Varnado was shown a high school prom photograph of both defendants and either Michael Tenner or Michael Rhea, who she confirmed were Price's friends.  Varnado went to the high school prom with Honore, along with his friends.  She agreed that it would not be unusual for Price to be hanging out with Michael Tenner or Michael Rhea.  Price once told her that if Honore ever caught her cheating on Honore, Honore would kill her and the person she was cheating with.  She thought this happened in 1998.  She said Honore and Price once went to a male friend's home looking for Varnado.  Varnado was at the house visiting with two other friends, but the male friend told Honore and Price that Varnado was not there.  It was after this that Price told her that if Honore had caught her there they would have been "spread" all over the house.

Varnado agreed that it was common for her to see Price in the neighborhood.  On the night in question, Varnado first said it was approximately 1:30 p.m. that Honore and Price accosted her as she was attempting to exit her car with her Wal-Mart purchases.  She then said it was about 1:00 or 2:00 a.m., but not 3:00 a.m.  She also estimated that she was with them for only ten to fifteen minutes.  She subsequently said she did not know what time it was.  Varnado said Honore was wearing a mask; she could see his mouth, but not his eyes.  Price was wearing a dark-colored jacket with a

hood tied tight over his head, with a white towel, like a small washcloth, over his mouth and nose.  It later slipped below the nose, but still covered the mouth.  She could not see his hair.  Neither one of the defendants referred to her by name.  Varnado was asked on cross examination if it was fair to say that the only thing that seemed to be on the minds of the two men was money and dope.  She replied in the negative, stating that the only thing on their minds was killing Rickey Thomas, because they would have taken the $600 she offered them if they wanted money.  She conceded that dope and money were the things they said they wanted.

Varnado said the victim and Honore struggled over the gun that Honore had out, and Honore shot the victim in the side.  When she ran down the stairs after Price came up, she was barefooted.  Her shoes came off when Honore removed her from the car.  Varnado said she did not recognize the man who took the telephone from her and talked to police as someone from the apartment complex.  She agreed that she was hysterical at that time.  Sgt. McNabb was the only person to whom she told who did it.  Varnado was shown her statement.  The interview began at 6:00 a.m., some two and one-half hours after the time of the crime, which was listed as occurring at 3:20 a.m.  The interview ended at 7:47 a.m.  Varnado admitted that when Sgt. McNabb asked her if she knew who had been with Honore, she said she did not know.  She did say that she was not sure, but that she thought it could have been Honore's friend, Tully.  Varnado said she

was afraid for her life because they had threatened to kill her.  She said that was why she had moved to another state and could not live at home.  She conceded that when Sgt. McNabb was concluding the interview and asked her if there was anything she would like to add or delete from the statement, she replied: "I think that's about it."

Felicia Varnado testified on cross-examination by Honore's counsel that Honore carried the shotgun and Price carried a silver revolver.  She said that at the point when she was sprayed with what she thought was pepper spray, she had not yet identified the men.  She said the person in the back seat sprayed her as they were driving her around.  One of the men was driving and the other was in the back seat.  They switched places after stopping at the river/levee.  She was sprayed after that.  Varnado said that when they got to the victim's apartment complex, she turned and saw that the little washcloth on Price had fallen below his nose.  That was when she recognized him.  She recognized Honore when he came around to get her out of the car.  She said she put it all together and realized it was them.  She lost one of her sandals when Honore pulled her out of the car.  One sandal was left in the car, one was left outside.  Varnado did not recall the name of the officer who first showed up on the scene, nor did she recall telling him simply that it was two black suspects.  She said that when she gave her statement she said she did not know who it was, although she was thinking it was the defendants.  She testified that she then came back and thought about things, and identified the two men as Price and Honore.  Varnado was asked about not saying anything in her statement about

recognizing Honore's voice. Varnado replied that there were things she left out because she was upset and in shock. She was confronted with her prior testimony given at another hearing when she stated that she told police that she "thought" it was Price and Honore.

Varnado admitted telling police that she could see Honore's eyes, but meant that she could see through the holes in the mask.  However, she said she could not see the eyes well enough to recognize him by his eyes.  She said Honore had a distinctive walk, and that she noticed it when they arrived at the victim's apartment complex and Honore exited the car and walked around her.  She admitted failing to mention this to Sgt. McNabb when she gave her statement, but said that she was afraid and was still afraid. Varnado knew Honore had lived in Tennessee, and that he had two brothers and three sisters who lived there.

Dave Levy, with the Jefferson Parish Sheriff's Office, processed the homicide scene on November 11, 1999.  Levy identified photographs of the scene, and also of 708 Lizardi Street.  He took the Lizardi Street photographs at approximately 8:00 a.m., photographing a five-count box of Federal Premium twelve-gauge, three-inch Magnum, "double ought" buckshot shotgun shells.  He also photographed a spent shotgun shell of that same brand, gauge, shot size, and length, found in the parking area adjacent to the apartment complex at the homicide scene.  Levy photographed two buckshot pellets and two bullets found underneath the victim's body.  He identified those two pellets and

two bullets in evidence.  Levy found two fingertips from a latex glove on the rear floorboard of a red Dodge Neon.

Dave Levy testified that the shotgun shell box and the interior of the red Dodge Neon were processed for fingerprints in his presence, but that no identifiable prints were found.  Levy said a towel or face cloth was recovered from the vehicle.  Levy seized a black shoe from the rear seat of the red Dodge Neon.  Levy was shown a crime scene photograph of the interior of the victim's apartment, depicting what he said appeared to be a woman's black shoe.  He said that according to the crime scene report, this second shoe was not retrieved as evidence.

Dr. Paul McGarry, qualified by stipulation as an expert in the field of forensic pathology, autopsied the victim on November 11, 1999.  There were nine gunshot wounds, seven from bullets, two from buckshot (shotgun pellets).  The two shotgun wounds would have been fatal, as would have one bullet wound penetrating the heart.  A second bullet wound penetrating the lung would have been fatal if not promptly and effectively treated.  The cause of death was seven gunshot wounds and two shotgun wounds that caused massive bleeding.  Dr. McGarry said he did not know which wound came first, but confirmed that the victim was alive-his heart was still beating-when at least one shotgun and one pistol wound was inflicted in the chest and/or abdomen.

Dr. McGarry said the plastic shotgun-wadding cup was three-fourths of an inch in diameter, which he represented as the size of a twelve-gauge.  Two copper jacketed 9mm diameter bullets, and one bullet without a jacket, were recovered during the autopsy.  Dr. McGarry said on cross examination that his findings suggested at least two guns were used, a shotgun and a handgun of either a 9mm or .38 caliber.  He said those bullets measure so close together that one cannot tell the difference between a 9mm bullet and a .38 caliber bullet.  He opined that a ballistics expert could tell whether the bullets were fired from the same gun.

Charles R. Watson Jr., with the Louisiana State Police Crime Lab, was qualified as an expert in the field of fingerprint testing and firearms identification.  He examined five 9mm/.38 caliber bullets.  Three of them, with copper jackets, were fired from the same gun.  Two of the five bullets were unjacketed lead, and were fired from the same gun.  He said the widths of the "lands" and "grooves" of the three copper and two unjacketed lead bullets had the same measurements.  However, he could not say the jacketed and unjacketed lead bullets were fired from the same gun, but neither could he exclude that possibility.  This was because a copper jacketed bullet and a lead bullet react differently. He attempted to but could not lift any fingerprints from the two fingertips from a latex glove or gloves recovered from the red Dodge Neon.  Watson was shown a photograph of the victim, and asked to assume that a wound evidencing massive amounts

15

of blood and tissue around it was caused by a 12-gauge-shotgun blast.  Watson conceded that it was within the realm of possibility that blood might have ended up on the perpetrator.  However, he said on redirect examination that he would not expect DNA evidence to be on such a perpetrator who took several showers and came back several days later in a different set of clothing.

Ray Poteet lived in the same apartment complex as the victim Rickey Thomas.  Poteet lived downstairs, in apartment 105; the victim lived above him, one apartment over, in 206.  At approximately 3:00 a.m. on November 11, 1999, Poteet heard three gunshots.  He got out of bed, put on his glasses, and peeked out his front window to see two black males run down the stairs and enter a red Dodge Neon.  The vehicle pulled forward, then sped backward in a westbound direction.  He did not get a good look at their faces.  Poteet went upstairs to the victim's apartment to find Felicia Varnado standing by the victim's body, on the telephone, screaming hysterically that they shot her boyfriend and stole her car.  Varnado handed Poteet the telephone; the 911 operator was on the line.  Poteet recalled asking Varnado if she knew who shot the victim, and she replied in the negative.

Detective John Graf, of the St. Bernard Parish Sheriff's Office, testified that he took photographs of defendant Honore when he surrendered himself on December 8, 1999, in the company of an attorney.  Det. Graf took the photographs because Honore had

16

injuries to his neck and cuts on both wrists.  Harbor Police found the red Dodge Neon in

New Orleans, in the Ninth Ward.  Det. Graf went to the scene.  He could tell from the

road dirt and circular marks on the vehicle that it had been wiped from the top to three or

four inches below the door handle.  He went over the car looking for fingerprints, inside

and out, but found none, not even those of Felicia Varnado, the owner of the vehicle.  No

cash or jewelry was found in the red Neon.

       St. Bernard Parish Sheriff's Office Detective Sergeant Robert McNabb

confirmed on cross-examination that no fingerprints were found on the red Dodge Neon.

He also confirmed that when defendant Honore surrendered himself that counsel

accompanying him requested in writing that Honore be give a medical examination as

soon as possible.  The attorney's writing also noted that Honore appeared to be recovering

from serious injuries and was in possession of medical supplies.  Sgt. McNabb took a

taped statement from Felicia Varnado after the murder and typed it up for her signature.

During her interview, Varnado often referred to one suspect as the "other guy" or "the

guy with the towel."  Sgt. McNabb recalled that when asked if she knew the person's

name, she replied that she could not be sure, but that it could be "Tully."  Sgt. McNabb

confirmed that she described Tully as "his friend."  Varnado subsequently identified that

person, Tully, as defendant Uralle Price, although not in a formal statement.

17

Sgt. McNabb said a person described as six feet tall or over was seen fleeing the red Dodge Neon at the location where it was later found abandoned.  Sgt. McNabb's testimony established that Felicia Varnado identified defendant David Honore as one of the perpetrators, and that she knew it was him because she had dated him for five years.  She recognized his stature, his voice, his eyes and his mouth-he had gold teeth.  She also said she knew it was him because he did not hurt her.  Varnado said she was taken to the apartment at gunpoint, and was pushed back when a struggle began between defendant Honore and the victim.  She ran down the stairs screaming for help as Price came upstairs.  As she went down the stairs she heard the first shot.  She turned and saw the victim fall.  She continued down, hearing more shots, and looked back to see Price fire at least one shot from the shotgun.  Varnado said she believed the perpetrator with the shotgun had ejected a shotgun shell in her car, but one was never found there. Varnado stated that some type of spray or mace was wiped in her eyes when her kidnappers drove her to the river.  Varnado told Sgt. McNabb that she feared defendants and their families.  She attributed discrepancies in her statements to fear for her safety.  In interviews subsequent to the first one, Varnado expressed no doubt in her identification of defendants.  Sgt. McNabb said Kenneth Cain, Price's uncle, was with Price when he surrendered to police.

18

Kenneth Cain, defendant Price's uncle, lived one block from Price's Lizardi Street home, where Price lived with his parents.  Cain accompanied Price, the son of his sister Linda, when Price surrendered to police.  Cain had known defendant Honore for most of Honore's life.  Cain said Honore was in Tennessee between November 12, 1999, the day after the murder, and December 1, 1999.  Cain admitted two prior felony convictions, possession of stolen property in 1981 and possession of cocaine in 1990.  Cain replied in the negative when asked whether he had seen defendant Honore on November 10 or 11, 1999.  He could not say where defendant Price was on the night of November 11, 1999.

Sidney Snow recalled an occasion in November 1999 when he telephoned the Harbor Police about an abandoned, possibly stolen, car in his New Orleans neighborhood.  He first stated that the car was a white, full-sized car, but was not positive, noting that it was dark.  He could not identify a photograph of the red Dodge Neon as being the car, but said it fit the description and size, and said if the photograph was taken that night it was the car he saw.  He heard the car pull up, heard at least two voices, and within seconds saw a person five feet nine to six feet two inches tall run past his residence in an uptown direction.

Martin Honore, defendant David Honore's brother and a resident of Tennessee since 1996, was asked where David was on November 10, 1999.  Martin said

19

defendant Honore was in Memphis, working with him cleaning windows on that date.

However, Martin subsequently conceded that he did not know the exact date.  What he

recalled was that he learned from his sister one day in November, 1999 that defendant

Honore was wanted by police for something that had happened on the previous day.  He

knew defendant Honore had been working with him on that day and did not get off work

until around 5:30 p.m.  Martin could not recall how often he saw defendant Honore

during the month of November; he first said almost daily, but then said every couple of

days.  Martin thought that defendant Honore had a full-time job, apparently unaware that

he had quit that job.

Paul Honore, another of defendant David Honore's brothers, testified that

the family had two brothers and three sisters living in Memphis, and that defendant

Honore had been living there as of November, 1999.  The police in New Orleans came

looking for defendant Honore in November, 1999, and Paul told them he was in

Memphis.  Paul guessed that he had last seen defendant Honore some two months before

then.  To the best of his knowledge, defendant Honore was in Memphis on the night

before police came looking for him, and had been in Tennessee for about nine months

prior to that time.  He said police found none of defendant Honore's clothes or personal

belongings when they searched his parents' Dauphine Street residence.  Defendant

Honore had no transportation of his own in November 1999.  Paul testified on cross-

20

examination that he never talked to defendant Honore or received any letters from him, but assumed he had been living in Memphis.

Lisa Parker, twelve years old at the time of trial, testified that she lived at 1015 Government Street, Apartment 106, underneath the victim's apartment.  She was lying in bed when she heard Felicia Varnado cursing and telling Rickey Thomas that he stole her car.  Lisa later heard what sounded like men and one woman running up or down the stairs.  She looked out of her peephole and saw what looked like two males going up the steps.  After that, Lisa said she had heard bumping on the floor, like something hit the floor.  Lisa replied in the negative when asked whether she heard anything else from the apartment, i.e., a gunshot.  However, she stated on cross-examination that she heard something that sounded like a car backfiring, approximately four times.  Lisa indicated that, in retrospect, the sounds were gunshots.  She later saw two men drive off in a red car.  Before they did, Lisa said a female she thought was Felicia Varnado unsuccessfully attempted to get inside, but the man on the passenger side kept closing the door on her.  Later she was asked if she could tell why Felicia Varnado did not get into the car, Lisa said she guessed it was because she was scared for her life.  The female yelled at the men that they stole her car.

Lisa was also asked on cross examination whether anyone had ever asked her to lie, and she replied in the affirmative, naming Price's defense counsel, the very

attorney who was then cross-examining her.  Lisa started to say that her mother told her that defense counsel did or said something, but was interrupted by defense counsel who asked whether the witness had ever talked to him.  Lisa replied in the negative.  Under follow up questioning on this issue, Lisa explained that counsel for Price had asked her mother to lie, to say that the two guys she saw running were not black.  Lisa said the two men she saw running down the stairs were black.  Counsel for Price asked Lisa why she was afraid of him, and she replied that it was because he was a "tall guy."  Lisa said her mother did not observe as much of what occurred outside that night as she did, as her mother only briefly looked out of the window.

           Linda Williams testified that defendant Uralle "Tully" Price was her son, and that he lived with her at 708 Lizardi Street with her three other sons and her fiancé.  Defendant Price and her other sons lived on one side of the double residence.  On the day Price was arrested, Williams was called from her nursing job and told that St. Bernard Parish authorities needed to talk to him.  She went home and spoke with the authorities.  Her brother later took Price home.  They contacted defense counsel, and Price surrendered to authorities.  She did not see a shotgun shell in front of their home when she left for work on the morning Price was arrested, but admitted that it was still dark at that time.  Williams testified that she had last seen defendant Price on the night before he was arrested, between eight and nine o'clock.  He was in his bedroom with his girlfriend,

Kenyatta Santiago.  Williams could not say that he had not gone out afterward.  She admitted that Price would go out at night without telling her, some nights staying out all night.

Charles Varnado, the father of Felicia Varnado, testified that David Honore telephoned him about 7:00 or 8:00 a.m. on the day of the shooting.  This would have been after the shooting.

Lolita Rhea testified that she resided in New Orleans at 1820 N. Claiborne Avenue with her son Michael, who was about the same age as defendant Price.  She said that the night before Price was arrested, he was at her home when she went to bed.  Rhea stated that Price was also there when she woke up.  She did not know if he had remained in the residence after she went to bed.  Lolita Rhea subsequently said she was confused about when Price was at her home.  Price's uncle came to her home the morning Price was arrested.  He asked where Price was and was told he was in the back.  The uncle then walked to the back.

Michael Rhea testified that he had grown up in the same neighborhood as defendants Price and Honore, and knew them both.  He was with Price on the day before the murder, and said Price was in his presence from at least 12:00 a.m. until 5:00 a.m. on the day of the murder.  He drove to Price's home that night and honked his horn.  Price came out, got into his mother's Cadillac, and both drove separately back to Rhea's

23

residence on N. Claiborne.  They went inside for a little while, left to drive around, and returned.  A friend, Michael Tenner, a shipyard welder who got off work at night, came to the Rhea residence after Michael Rhea's mother and sister were asleep.  Michael Rhea was asked what time Michael Tenner got off work, and he said about 1:00 a.m.  When asked what time Michael Tenner got to the Rhea residence, Michael Rhea said about midnight or 1:00 a.m.  Once Michael Tenner arrived, he and Michael Rhea and Price waited for some girls to telephone.  The girls never called or showed up. Price had to return his mother's car by 5:00 or 6:00 a.m.  Michael Tenner followed Michael Rhea and Price to Price's residence between 4:00 and 5:00 a.m.  When they got to Price's Lizardi Street residence, Price went in the gate and gave the keys to his stepfather, and left with Tenner and Rhea.  Rhea did not see Price's stepfather or his mother.  The three drove back to Rhea's residence in Tenner's car.  They stayed there until the morning.  The first time they learned anything was wrong was when Kenny Cain, Price's uncle, came to the residence.  Price remained at the residence until 11:30 p.m. or 12:00 a.m. that night. Before leaving, Rhea, Tenner and Price went to get some fried chicken at a Popeye's outlet four blocks away, and returned to eat it with Rhea's mother.  At some point thereafter, Price left with his uncle.  Rhea replied in the affirmative when asked whether his testimony was the truth.

24

Michael Rhea was asked on cross-examination whether anyone he knew had a shotgun or a pistol; he replied in the negative.  Rhea said Kenyatta Santiago was the mother of Price's baby.  He did not know the status of their relationship, but said she stayed with Price off and on.  Rhea said he got to Price's residence at 8:00 or 9:00 p.m. on the night of November 10.  After Price came out and got into his mother's Cadillac, they drove back to Rhea's home, arriving there at 10:00 or 11:00 p.m.  They drove around looking for girls on the way back.  Rhea said his mother was sleeping, but awoke and glanced up when Rhea and Price came in.  He beeped Michael Tenner, who got there about 12:45 or 1:30 a.m.  Rhea said he could not remember when they went to sleep, but said they woke up between 5:00 and 6:00 a.m. because Price had to take his mother's car home.  Rhea did not know where defendant David Honore was that night.

Corey Washington, defendant Price's stepfather, testified that in November, 1999 he was living with Price and Price's mother at 708 Lizardi Street in New Orleans. Washington was working long hours at the time for a construction company.  On the morning Price was arrested, Washington opened the door to leave for work just as Price was coming inside.  It was approximately 4:15 a.m.  When Price saw Washington, Price gave him his mother's keys.  Washington saw Michael Rhea and Price leave in Michael Tenner's car.  Washington had seen Price at approximately 8:00 p.m. the night before. He

did not know where Price had been between then and the time he saw him the next morning.

Washington said on cross-examination that he had not seen David Honore since June, 1999, and that to his knowledge Honore had been living in Tennessee with his sister.  Washington stated that Michael Rhea was driving a white Chevrolet Camaro in November, 1999.  Washington saw Kenyatta Santiago talking with Price in the Lizardi Street residence on the night before Price was arrested.  Washington admitted two prior convictions, for simple burglary and theft, and said he was on parole until 2003.

Michael Tenner testified that defendant Price was his friend.  He remembered the day Price was arrested.  In November, 1999, Tenner was working at Halter Marine Shipyard from 4:30 p.m. until 1:00 a.m.  Michael Rhea and Price paged him earlier on the night before Price was arrested, asking him to meet them at Rhea's home after he got off work. He went straight there after work to meet the two. They sat around and talked, waiting for some girls to come.  The girls never came. Tenner said he was driving a black and white Camaro at that time.  He later followed Price and Rhea to Price's home so Price could drop off his mother's Cadillac.  It was about 4:00 or 4:30 a.m. Price went inside for no more than a minute.  Price did not change clothes while he was inside, and he was wearing the same clothes he had been wearing all night.  They went back to Rhea's home.  Later in the morning Price's uncle came to Rhea's house.

26

Afterward, they bought some chicken and ate it at Rhea's home.  Tenner answered in the negative when asked whether Price could have killed anyone at 3:00 a.m. that morning.

Tenner knew defendant David Honore, but did not see him or speak to him on the night in question.  Defendant Price did not tell Tenner anything about Honore, i.e., that he had seen him or been with him earlier, or that he had talked to him.  Tenner was not sure where Honore was residing at the time, but knew that he was out of town.  Tenner had not seen Honore for approximately one year at that time.

Tenner said on cross examination that when he arrived at Michael Rhea's residence, Rhea's car was there, and so was Price's mother's Cadillac.  Michael Rhea's mother was at home sleeping when the three were at Rhea's that night.  Tenner answered in the negative when asked whether he knew of anyone who owned a gun.  He did not see Corey Washington at Price's home when Price went to drop off his mother's car keys.  He never saw an empty box of shotgun shells in front of Price's home the morning Price was arrested.  Tenner said he went to work at 4:30 p.m. on the day Price was arrested, and that he had only slept about one and one half hours at Rhea's house.

Defendant Price testified that he graduated from high school and was working with his uncle's construction company at the time he was arrested. He had been undecided between entering the military and going to college. He knew Felicia Varnado from the neighborhood and through her relationship with David Honore.  Price said he

never had any problems with Felicia, but said she had the wrong person.  Price said he

had nothing to do with the shotgun shell box found in front of his residence on Lizardi

Street.  Price stated that on the night before the murder, his girlfriend (Kenyatta Santiago)

came over with their child.  Michael Rhea came over sometime after eight o'clock, and

the two left, Price in his mother's Cadillac and Rhea in his car. After dropping off Rhea's

car, the two rode around in the Cadillac. They ran across three females, and they talked of

meeting later that night. Price and Rhea beeped Michael Tenner, who said he would come

over after work. Rhea and Price subsequently went to Rhea's home, and Tenner came

over. Price replied in the affirmative when asked whether he had seen Rhea's mother and

Rhea's sister at Rhea's home. The three, Price, Rhea and Tenner, stayed at Rhea's home

until they left to drive to Price's home so Price could drop off his mother's car and keys.

Price said he saw Corey Washington in the front room of his home when he went to drop

off the keys.

Price said he had a traffic court appearance on November 11, 1999 on a

traffic citation.  The citation was introduced in evidence.  Price said he telephoned his

home to ask Kenyatta Santiago to get some clothes ready for him to wear to court, and his

uncle answered the phone and told him police wanted to question him about a murder.

His uncle said he would call Price's attorney, and Price waited at Rhea's home.  He bought

some fried chicken, which they all ate.  He had a receipt for the chicken in his pocket

when arrested, reflecting a purchase at 1:06 p.m. on November 11, 1999.  The receipt was introduced in evidence.  Price answered in the negative when asked whether he was involved in or had any information about the abduction and kidnapping of Felicia Varnado.  Price answered in the negative when asked whether he knew the victim Rickey Thomas, or anything about his murder.  Price said his nickname was "Tully."

Price said he had known defendant David Honore all of his life. He had not heard from Honore within the twenty-four hours prior to Price's surrender to police on November 11, 1999.  He had last seen Honore, who was living in Tennessee with his family, when Honore came in town for a wedding in the summer of 1999.  Honore did not have a car at that time.  Price never saw Honore threaten any other man in the company of Felicia Varnado, even though Honore had seen her in the company of other men during the time Honore and Varnado were going out together.

Price listed Kenyatta Santiago as one of his alibi witnesses, the mother of one of his three children.  Price did not work on the day before the murder, November 10. He left his home with Michael Rhea at 8:00 or 9:00 p.m., driving his mother's Cadillac. Price said he was wearing pajama bottoms and a T-shirt that night, what he said he usually wore.  He changed clothes the next day before going to see his attorney.  Price was asked on cross examination why he dropped off his mother's car at 4:00 a.m. and returned to Michael Rhea's home instead of simply staying at home and going to sleep.

He replied that he needed a ride to traffic court later that day, and that if he stayed at home he would have been stuck.  He admitted that he did not have to be at court until 4:00 p.m., but said that he planned to go home later and get dressed for court.  He did not change clothes when he returned his mother's Cadillac because Corey Washington was getting ready for work and everyone else was asleep.

## IV.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).  *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the

"contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## V.  MERITS

### A.  Claim 1):  Improper Reference to Invocation of Right to Remain Silent

During opening remarks, the prosecutor stated:  "Mr. Price surrenders himself to the St. Bernard Parish jail accompanied by a letter from Mr. Rakosky that he has a lawyer, and don't talk to him; don't ask him anything, which is his right."  *Price*, 842 So.2d at 513.  Petitioner claims that the above comment, referencing his decision to exercise his right to remain silent, constituted, pursuant to the Supreme Court's decision

31

in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), a violation of his right to due process.[8]

In *Doyle*, 426 U.S. at 619, 96 S.Ct. at 2245 (footnote omitted), the Supreme Court held that the prosecution's "use for impeachment purposes of petitioner's silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment."  Subsequent law has made clear that the due process protection enunciated in *Doyle* is triggered by a petitioner's "'receipt of *Miranda* warnings'".  *Vick v. Lockhart*, 952 F.2d 999, 1003 (8th Cir. 1991), *quoting United States v. Massey*, 687 F.2d 1348, 1353 (10th Cir. 1982).  *See Fletcher v. Weir*, 455 U.S. 603, 606, 102 S.Ct. 1309, 1311, 71 L.Ed.2d 490 (1982) (*per curiam*) (prosecution's use, for impeachment purposes, of post-arrest pre-*Miranda* silence not violative of *Doyle*); *United States v. Disbrow*, 768 F.2d 976, 980 (8th Cir.), *cert. denied*, 474 U.S. 1023, 106 S.Ct. 577, 88 L.Ed.2d 560 (1985) ("*Doyle* rule applies when a person is silent **after** receiving his/her *Miranda* rights [emphasis original]."  If petitioner did not receive *Miranda* warning at the time he arrived at the police station and was arrested, then due process protection discussed in *Doyle* did not attach).

In *Vick*, 952 F.2d at 1000, as in the instant situation, the petitioner turned himself in, voluntarily entering the police station with instructions from his lawyer that he

---

[8]*See* Federal rec., doc. 1-3 at pp. 19-20.

did not have to make a statement.  When the fact that petitioner, at the time he voluntarily surrendered to police, had exercised his right to remain silent was brought to the jury's attention at trial, an objection was lodged and petitioner argued that the prosecution's questioning/comments regarding his silence constituted a due process violation as recognized in *Doyle.  Id.* at 1001.  The Eighth Circuit, however, rejected this argument, determining that the time when petitioner was advised of his *Miranda* rights signaled the time when petitioner's right to remain silent was constitutionally protected.  *Id.* at 1003; *see also Grancorvitz v. Franklin*, 890 F.2d 34, 43 (7th Cir. 1989), *cert. denied*, 495 U.S. 959, 110 S.Ct. 2566, 109 L.Ed.2d 749 (1990) (fact that petitioner's "silence was the result of his attorney's advice that he speak to no one ... does not automatically transform silence into constitutionally protected silence").

In the instant matter, it is undisputed that petitioner's decision to exercise his right to remain silent, the decision which the prosecution brought to the jury's attention during opening remarks, took place prior to the time petitioner was advised of his *Miranda* rights.  As such, the due process protection enunciated in *Doyle*, *supra*, had not yet attached.  Accordingly, petitioner, by virtue of the prosecutor's reference to his silence, suffered no constitutional violation and, therefore, is not entitled to federal habeas corpus relief.

**B.  Claim 2):  Failure to Properly Respond to Jury's Inquiry Regarding the Meaning of "Reasonable Doubt"**

   At petitioner's trial, the jury, during its deliberations, "submitted a request to the court seeking a written explanation of reasonable doubt, and asking 'what doubt is reasonable.'" *Price*, 842 So.2d at 511.[9]  In response, the court advised:

>   I can't answer questions for you.  The only thing I can do is reread my jury charge to you concerning the reasonable doubt standard.  I'll reread this.  While the State must prove guilt beyond a reasonable doubt it does not have to prove guilt beyond all possible doubt.  Reasonable doubt is doubt based upon reason and common sense and is present when after you have carefully considered all the evidence, you cannot say your [sic] firmly convinced of the truth of the charge.  That is the reasonable doubt standard.  If that answers your question, you can return to deliberate.  If you need further clarifications, you can consult with each other.[10]

   In its original charge to the jury, the court advised:

>   The defendant is presumed to be innocent until each element of the crime necessary to constitute his guilt is proven beyond a reasonable doubt.  The defendant is not required to prove his innocence.  Thus the defendant begins the trial with a clean slate.  The burden is upon the State to prove the defendant's guilt beyond a reasonable doubt.  In considering the evidence, you must give the defendants the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence.  If you're not convinced of the guilt of the defendants beyond a reasonable doubt, you must find them not guilty.  While the State must prove guilt beyond a reasonable doubt, it does not have to prove guilt beyond all possible doubt.  Reasonable doubt is doubt based on reasonable common sense, and is

---

[9]*See also* State rec., vol. 11 of 11, trial transcript at p. 164, lines 23-26.

[10]*See* State rec., vol. 11 of 11, trial transcript at p. 165, lines 1-17.

present when, after you have carefully considered all the evidence, you cannot say you are firmly convinced of the truth of the charge.[11]

The above charge is in accordance with La.C.Cr.P. art. 804(A) which

provides:

> In all cases the court shall charge the jury that:
> (1) A person accused of crime is presumed by law to be innocent until each element of the crime, necessary to constitute his guilt, is proven beyond a reasonable doubt;
> (2) It is the duty of the jury, in considering the evidence and in applying to that evidence the law as given by the court, to give the defendant the benefit of every reasonable doubt arising out of the evidence or out of the lack of evidence in the case; and
> (3) It is the duty of the jury if not convinced of the guilt of a defendant beyond a reasonable doubt, to find him not guilty.
> The court may, but is not required to, define "the presumption of innocence" or "reasonable doubt" or give any other or further charge upon the same than that contained in this article.

Petitioner argues that the trial court erred in failing, in response to the jury's inquiry regarding the meaning of "reasonable doubt", to reiterate its entire original charge provided to jurors in accordance with the provisions of La.C.Cr.P. art. 804(A).  The trial judge, however, explained, that the other portions of his original charge involved "presumption of innocence" and "burden of proof", two subjects about which the jury did not make further inquiry.[12]  The court further advised that if he reread to jurors those

---

[11]*See* State rec., vol. 11 of 11, trial transcript at p. 147, lines 3-25.

[12]*See* State rec., vol. 11 of 11, trial transcript at p. 168, lines 10-26.

unrelated "portions of the charge", "beyond what [the jury] asked for," "I would then

become pro active in determining what I think they should like to hear again."[13]

In addressing this issue in connection with petitioner's direct appeal, the

Louisiana Fourth Circuit reasoned:

> [I]t is not error where a trial court declines to give an additional instruction
> as to a matter outside the scope of the jury's request for additional
> instructions. *See State v. Jenkins,* 98-1603 (La.App. 4 Cir. 12/29/99), 750
> So.2d 366. In *Jenkins,* the defendant was being tried for first-degree
> murder, which allegedly occurred during the perpetration of an armed
> robbery. Defendant maintained that he acted in self-defense when the
> victim attempted to force him to engage in homosexual relations. Two
> hours into deliberations, the jury sought additional instructions on the law
> of first-degree murder, second degree murder, manslaughter, and justifiable
> homicide. On appeal, the defendant argued that the trial court erred in
> failing to reinstruct the jury concerning his homosexual rape self-defense
> theory. This court found no error in the court's failure to give such a
> reinstruction because the jury did not request it, and the trial court had
> already given a charge on the definition of a rape as a violent and forcible
> felony when it initially instructed the jury. *Jenkins,* p. 23-26, 750 So.2d at
> 379-380. The instant case is analogous to *Jenkins.* The jury requested only
> an instruction as to the definition of reasonable doubt, not the presumption
> of innocence. These are two different matters, as evidenced by La.C.Cr.P.
> art. 804(A), which explicitly states that the court may but is not required to
> define "the presumption of innocence" or "reasonable doubt." The jury
> requested a reinstruction on one of those two definitions, not both, and it
> cannot be said that the trial court erred in declining to give a reinstruction
> not requested by the jury.

*Price*, 824 So.2d at 512-513.

---

[13]*See* State rec., vol. 11 of 11, trial transcript at p. 169, lines 5-13.

It is well-established that federal courts possess only limited authority to consider state evidentiary determinations in a state prisoner's habeas proceeding. *Burgett v. Texas*, 389 U.S. 109, 113-14, 88 S.Ct. 258, 260-61, 19 L.Ed.2d 319 (1967). As long as an evidentiary ruling, such as what instruction should be provided in response to a jury's inquiry, is in accordance with state law and infringes no right protected under the Constitution, habeas relief is not warranted. *Id. See also Robinson v. Whitley*, 2 F.3d 562, 566 (5th Cir. 1993), *cert. denied*, 510 U.S. 1167, 114 S.Ct. 1197, 127 L.Ed.2d 546 (1994). *See also Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) (allegedly deficient jury instruction can serve as a basis for federal habeas corpus relief only if the deficient instruction "by itself so infected the entire trial that the resulting conviction violates due process."); *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974) (quotation omitted) ("[I]t must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.").

Based upon the above reasoning on the part of the Louisiana Fourth Circuit Court of Appeal, it is clear that the trial court, by virtue of its decision to reinstruct jurors only with respect to their specific question regarding the meaning of "reasonable doubt", acted in accordance with applicable state law. Nor was the court's decision in this regard violative of any constitutional right. Accordingly, petitioner's claim for habeas corpus

relief is without merit.

### C.  Claim 3):  Denial of Challenges for Cause

Petitioner argues that the trial court erred in denying his request to excuse two prospective jurors, William Justi and Stephanie Saizan, for cause.  The basis of petitioner's claim that William Justi should have been excused for cause is the response Justi provided to defense counsel's inquiry as to whether anyone would require a defendant to take the stand before they could return a verdict of not guilty.  Justi stated: "I think I would like to hear him, their opinion....  I'd like to hear his side instead of the lawyer's side, you know."[14]  When asked whether he would hold a defendant's decision not to take the stand against that defendant, Justi responded: "It's hard to say."  When counsel sought further clarification, asking, "[y]ou're not quite sure if you would require the defendant to testify, is that fair to say", Justi responded: "That's right."[15]

With respect to Stephanie Saizan, the basis of petitioner's claim that she should have been excused for cause primarily stems from the fact that her husband was a Louisiana State Trooper and had earlier served, for a period of five years, as a deputy

---

[14]*See* Federal rec., doc. 1-3 at p. 21; *see also* State rec., vol. 6 of 11, trial transcript at p. 73, lines 4-9 and 18-20.

[15]*See* Federal rec., doc. 1-3 at pp. 21-22; *see also* State rec., vol. 6 of 11, trial transcript at p. 74, lines 17-19; p. 75, lines 1-5; p. 76, lines 22-27.

with the St. Bernard Parish Sheriff's Office.[16]  As the Louisiana Fourth Circuit, in

addressing the instant issue in connection with petitioner's direct appeal, explained:

> Under questioning by counsel for defendant Price as to whether she would
> be more inclined to believe a police officer, Saizan said that she would do
> what the court would ask of her, putting aside any respect she had for a
> police officer witness.  However, under further questioning, she admitted
> that she would probably find a police officer a credible witness, because of
> the job officers perform.  Saizan knew St. Bernard Parish Sheriff's Office
> employees Gina Holland, whom she described as a friend, Captain Marcel
> David, whom she described as her husband's friend, and Deputies Scott
> Davis and David DiMaggio, all names she heard mentioned as possible
> State witnesses.  However, none of these persons testified at trial.
>
> Counsel for Price queried Saizan once more as to whether she could
> hear the case without any bias in favor of believing the State's police
> witnesses:
>
> MS. SAIZAN:
>
> I think I could.
>
> MR. RAKOSKY [defense counsel]:
>
> You want to, don't you?
>
> MS. SAIZAN:
>
> Yeah, I like to believe I could be.  I like to think I could, but it's very
> possible maybe I couldn't.
>
> MR. RAKOSKY:
>
> And you realize if there is doubt in your mind, if there is doubt in your
> mind, tomorrow I can't do anything about it, and you can't do anything
> about it?
>
> MS. SAIZAN:
>
> That's fine.
>
> * * *

---

[16]*See* Federal rec., doc. 1-3 at p. 22; *see also* State rec., vol. 7 of 11, trial transcript at p. 258,
lines 4-14.

MR. RAKOSKY:

Is it fair to say that you are not sure whether you could be a completely impartial juror in this case?

(Objection and discussion)

MR. RAKOSKY:

I'm asking her if it is fair to say that you have doubts about whether you could be a completely impartial juror?

MS. SAIZAN:

Yes, there is a doubt.


When the jurors were asked as a group whether any of them had any involvement with the prosecutor through civil litigation, Stephanie Saizan replied that the prosecutor was representing her sister and brother-in-law in a civil matter.  When asked whether this added to the problem relating to the police officers, Saizan said the civil matter would have no effect on her as a juror.  Counsel for defendant Price said, "Not like the other matters involving the police officers?"  The record reflects that Saizan indicated an affirmative response to that question.

The court subsequently questioned Ms. Saizan as to whether she could put aside her life experiences to apply only the law as given by the court and render a fair and impartial verdict.  She indicated an affirmative response.  The court continued:

THE COURT:

And you answered in the last question, that you have some doubt as to whether you could be a good juror.

MS. SAIZAN:

I think I could be a good juror.  But you know, there's just so many doubts, I guess, that maybe.

THE COURT:

Well, given the fact that everybody can second guess any decision they make in life, and that that [sic] can be any juror, that you don't want to participate in doing something that should not be done.

MS. SAIZAN:

(Indicates affirmative response).  Right.

THE COURT:

But will you give it your best shot?  Will you set aside the fact that you are the wife of a police officer.  He lives and dies and work [sic] for the law, and you have some friends that are officers, although, they may or may not take some part in this case.  Are you going to believe those witnesses more than you would believe another witness who you found to be credible, who you found to be telling the truth, whether it was a state witness or a defense witness?  Are you going to give the equal shot to believe those witnesses?

MS. SAIZAN:

Yes.

THE COURT:

Are you going to judge those witnesses the same?

MS. SAIZAN:

(Indicates affirmative response).

THE COURT:

Are you going to look at their testimony to see whether or not they are worthy of belief, whether or not, based upon their observations, the position in which they had, how they looked at things, whether or not their testimony is worthy of belief.  Are you going to do that?

MS. SAIZAN:

Yes, sir.

THE COURT:

And if you found, even though they may be a friend of your's [sic] or someone that you know, that their testimony did not stand that scrutiny, that they were not in the position that they had the best chance of seeing something, somebody else who was a layperson had a better chance or opportunity to see; are you going to believe the police officer's testimony over the lay witness in that instance.

MS. SAIZAN:

If the facts or the-I can't think of the word I want to use.  I guess I would have to see-oh, what is the word I'm looking for?

41

THE COURT:

Well, really, I'm just asking:  Is the fact that there is a police officer testifying going to override the belief that someone else is in a better position to have seen and done things and you would believe the police officer as opposed to another witness who had a better chance of seeing it?

MS. SAIZAN:

No.

THE COURT:

You give them both the same shot?

MS. SAIZAN:

Yes.

*Price*, 842 So.2d at 516-517.

Under Supreme Court law, a trial court's decision with respect to whether a prospective juror should or should not be struck for cause is entitled to considerable deference as such a finding is based upon determinations of demeanor and credibility that are peculiarly within the trial court's province.  *See Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985).  The same is true with respect to Louisiana law.  As the state appellate court explained:

A trial court is vested with broad discretion in ruling on challenges for cause and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion.  *State v. Williams,* 2001-1650, p. 9-15 (La.11/01/02), 831 So.2d 835, 845-848.  Prejudice is presumed when a trial court denies a challenge for cause erroneously and the defendant ultimately exhausts his peremptory challenges.  *State v. Ball,* 2000-2277, p. 12 (La.1/25/02), 824 So.2d 1089, 1102, *cert. denied,* 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107 (2002). La. Const. Art I, § 17 guarantees that "[t]he accused shall have the right to full voir dire

42

examination of prospective jurors and to challenge jurors peremptorily. The number of peremptory challenges shall be fixed by law." "Therefore, when a defendant uses all of his peremptory challenges, a trial court's erroneous ruling depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence." *State v. Cross,* 93-1189, p. 6 (La.6/30/95), 658 So.2d 683, 686.

A trial judge's refusal to excuse a prospective juror for cause is not an abuse of his discretion notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, when subsequently, on further inquiry or instruction, he has demonstrated a willingness and ability to decide the case impartially according to the law and evidence. *State v. Dunn,* 2001-1635, p. 15-17 (La.11/01/02), 831 So.2d 862, 875-876. However, "a challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." *Williams, supra,* quoting *State v. Hallal,* 557 So.2d 1388, 1389-90 (La.1990).

In the instant case, defendant Price exhausted all of his peremptory challenges, employing his last one-excluding the one allowed to him for selection of the alternates-to strike prospective juror Stephanie Saizan.

It is ground for a challenge for cause that a juror is not impartial, whatever the cause of his []partiality; another ground for a challenge for cause is when the juror will not accept the law as given to him by the court. La.C.Cr.P. art. 797(1), (2).

*Price*, 842 So.2d at 515.

Applying the above law to the applicable facts, the Louisiana Fourth Circuit, with respect to petitioner's challenge to prospective juror William Justi, noted that while the court did deny petitioner's challenge for cause, petitioner was not forced to use one of his peremptory challenges in order to remove Justi from the jury pool. Instead, petitioner's co-defendant, David Honore, struck Justi peremptorily. As such, the court

43

concluded that petitioner "was not deprived of any constitutional or statutory rights regarding his peremptory challenges.  No prejudice is presumed under these circumstances."  *Id.*

　　　　　　With respect to petitioner's challenge to prospective juror Stephanie Saizan, the court reasoned:

> Based solely on Ms. Saizan's responses during questioning by defense counsel, one would have to conclude that there was a substantial doubt as to whether she could be impartial insofar as evaluating the credibility of police witnesses. However, the court's subsequent questioning appeared to establish that Saizan could render an impartial verdict according to the law and evidence, could accept the law as give[n] to her by the court, and could impartially evaluate the testimony of all witnesses.  There are two aspects to the problem.  The first is Ms. Saizan's evaluation of police witness testimony when contradicted by testimony of a lay witness.  The second is her evaluation of uncontradicted police witness testimony, i.e., whether she would automatically accept it without assessing credibility by using her common sense.  The trial court's questioning of Ms. Saizan established that she would not automatically believe a police officer's testimony when contradicted by that of a lay witness.  While it appears that the court's questioning was primarily directed at that first aspect of the problem, it also addressed the second aspect, establishing that she would not automatically accept as true even uncontradicted testimony from police witnesses.
>
> In *State v. Mathis,* 95-0862 (La.App. 4 Cir. 6/5/96), 675 So.2d 1217, this court reversed the defendant's conviction for possession of cocaine on the ground that the trial court erred in denying his challenges for cause as to two prospective jurors on the issue of giving undue credibility to police officers.  One juror, who was married to a police officer, essentially stated that she would give more credibility to police officers than to any lay person off the street.  The prospective juror denied meaning that she could not be fair to the defendant, but again said she gave police more credibility than the defendant.  The second juror acknowledged that he felt that way, and appeared to state that he therefore would not be fair to the defendant. The second juror agreed that some police officers have lied under oath, but

said that nevertheless he would give police more credibility simply because they were police officers. This court noted that the State did not rehabilitate the prospective jurors, and concluded that the trial court abused its discretion by failing to grant the challenges for cause.

In *State v. Hallal,* 557 So.2d 1388 (La.1990), the court reversed the defendant's two armed robbery convictions because of the trial court's denial of a defense challenge for cause as to a prospective juror, the wife of a fifteen-year veteran of the Vernon Parish Sheriff's Office. The juror acknowledged that the defendant was presumed innocent until proven guilty; that the State had the burden of proof beyond a reasonable doubt; and that any impression she might have about the case would have to yield to evidence presented at trial. However, she indicated that she would believe the State's police witnesses not because they were law enforcement officers, but because she knew them, or at least five of them. She did not think they would lie. When asked by the trial court if she knew of any reason why she could not be fair, the juror answered in the negative, other than that she knew those potential police witnesses. The police witnesses had been involved in arresting the defendant, securing his unrecorded confession, and in retrieving evidence from the scene. The Louisiana Supreme Court noted its prior holdings that a challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied. The court noted that the prospective juror never expressly stated that she could put aside her acquaintanceship with the police officers, and found that it was not reasonable for the trial court to accept assurances that she would judge the case impartially on the evidence at trial since she began with the premise that the police officers directly involved in the arrest and questioning of the defendant were telling the truth.

In the instant case, as previously noted, none of the sheriff's office employees Ms. Saizan knew or was friendly with testified at trial. Further, her responses to the trial court's questioning were that she could fairly evaluate the credibility of all the witnesses, and judge them equally. In addition, while in no way can it be said that the testimony of law enforcement personnel in the instant case was not crucial to the State's case, unlike in *Hallal, supra,* there was no confession or statement given to police by either defendant. Also, the charged offense in the instant case was not

45

based on evidence seized directly from the defendant by police, unlike in *Mathis, supra,* where the arresting officers seized cocaine from the defendant, and necessarily had to testify to the facts of the stop and seizure to establish the offense.  Put another way, the State's burden of proof in the instant case was not as directly dependent upon police credibility as it was in *Mathis* and *Hallal.*  It was obvious that the trial court was aware of this factor.

Considering all of these factors, it cannot be said that the trial court abused its discretion in denying defendant Price's challenge for cause as to Stephanie Saizan.

*Price*, 842 So.2d at 517-519.

This court finds that the above reasoning does not represent an unreasonable application of Supreme Court law to the facts of the instant case. Accordingly, petitioner's claim for habeas corpus relief is without merit.

### D.  Claim 4): Denial of Effective Assistance of Counsel

The seminal Supreme Court decision regarding ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), wherein the Court held that in order to prove that counsel was unconstitutionally ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense.  If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the *Strickland* test, "it is necessary to 'judge...counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), *citing Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.  To prove prejudice under the *Strickland* standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

Petitioner claims that counsel was ineffective due to his failure to persuade the court to admit into evidence the statement which eyewitness Felicia Varnado provided to police shortly after the murder occurred.  Petitioner describes the statement as "a critical piece of evidence which "show[ed] that she told the police that she was unsure of the identity of the second suspect [i.e., petitioner]."[17]

A review of the trial transcript reflects that petitioner suffered no prejudice by virtue of counsel's failure to have Ms. Varnado's statement admitted into evidence because Ms. Varnado admitted, on cross-examination, that she did not identify petitioner as one of the assailants during her interview with police shortly after the incident took place.

---

[17]*See* Federal rec., doc. 12 at p. 9.

47

BY MR. RAKOSKY:

     Q.  Ms. Varnado, when you were telling Detective McNabb that night, describing for him what had happened at the time he was taking that statement from you, is it correct that everytime you referred to the person whom you've identified today as Uralle Price, that that night you referred to him as the other guy or the guy with the towel over his face?

     A.  Yes, I did....

     Q.  When you were asked by Detective McNabb if you knew who the other guy was, do you remember what your answer was?

     A.  I told him that I didn't know who the guy was.[18]

***

     Q.  Now, my question is when you were being asked questions that morning and he was typing them and typing your answers, did you at any other time tell Detective McNabb in that statement that the other person was Uralle Price?

     A.  I didn't tell him at that time.[19]

Petitioner 's next claim is similarly related to counsel's alleged ineffectiveness with respect to the admission of evidence.  Petitioner asserts that counsel failed to recognize "the exculpatory value of the combined police reports".  Had the reports been introduced into evidence, "the jury would have learned that the victim trafficked illegal drugs out of his residence", thereby supporting "petitioner's defense and

---

[18]*See* State rec., vol. 8 of 11, trial transcript at p. 125, lines 17-26 and lines 31-32; p. 126, lines 1-3.

[19]*See* State rec., vol. 8 of 11, trial transcript at p. 129, lines 14-20.

48

... counsel's argument that the men who shot and killed the victim were after money and drugs."[20]  As shown below, petitioner's argument in this regard is without merit.

LSA-R.S. 14:30.1A(2)(a) defines second degree murder, the crime for which petitioner was convicted, as the killing of a human being "[w]hen the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm."  Thus, even if the "combined police reports" contained the information which petitioner alleges they contained and if jurors had had access to this information and believed that petitioner and his co-defendant, David Honore, had gone to the victim's apartment armed with guns to rob him of drugs and money, with no intent to kill him, the elements necessary to support a conviction of second-degree murder would nevertheless have been present.  Therefore, petitioner suffered no prejudice due to counsel's alleged failure to recognize the "exculpatory value of the combined police reports" and have said reports admitted into evidence.

---

[20]*See* Federal rec., doc. 12 at p. 10.

Finally, petitioner claims that counsel was ineffective due to his failure to advise petitioner of plea bargains offered by the State both before and during trial. According to petitioner, the State, prior to trial, offered a deal whereby petitioner would have been allowed to plead guilty to the charge of "accessory-after-the-fact." Petitioner further contends that during trial the State offered a deal which would have allowed petitioner to plead guilty to the charge of manslaughter. Petitioner asserts that counsel failed to inform him of either of these offers.[21]

Generally, defense counsel's failure "to inform the defendant about a plea bargain amounts to ineffective assistance of counsel." *Chamberlain v. Quarterman*, 239 Fed. Appx. 21, 25 (5th Cir.), *cert. denied*, __ U.S. __, 128 S.Ct. 614, 169 L.Ed.2d 396 (2007), *citing Teague v. Scott*, 60 F.3d 1167, 1170 (5th Cir. 1995). A habeas petitioner, however, has the burden of proof with respect to a claim of ineffectiveness. An uncorroborated assertion that counsel failed to take some action or acted improperly is insufficient to satisfy this burden of proof. As the Seventh Circuit explained, in the context of a petitioner's unsubstantiated allegation that his attorney would not allow him to testify on his own behalf:

> [Such a] barebones assertion ... is insufficient to require a hearing or other action.... It just is too facile a tactic to be allowed to succeed. Some greater particularity is necessary - and also we think some substantiation ... - to give

_____

[21]*See* Fed. rec., doc. 1-3 at p. 24.

the claim sufficient credibility to warrant a further investment of judicial
resources in determining the truth of the claim.

*Underwood v. Clark,* 939 F.2d 473, 476 (7th Cir. 1991). *See also Turcios v. Dretke*, 2005

WL 3263918, *6 (S.D.Tex. 2005) ("[A] petitioner in a habeas proceeding cannot prevail

on such a claim merely by stating to the habeas court that he told his trial attorney that he

wished to testify and that his attorney forbade him from taking the witness stand. ")

        In the instant matter, there is no evidence to prove petitioner's claim other

than his statement to the effect that defense counsel failed to inform him of two plea

bargains offered by the prosecution.  "Standing alone, such self-serving statements cannot

be allowed to succeed or the criminal judicial process would become unworkable."

*Turcios*, 2006 WL at *6, citing *Underwood*, 939 F.2d at 475-76.  Accordingly, the court

finds that petitioner has failed to meet his burden to establish that he is entitled to habeas

corpus relief.

### E.  Claim 5): Insufficient Evidence

        Petitioner complains that insufficient evidence was submitted to support his

conviction due to the alleged weakness of Felicia Varnado's identification of him as one

of the assailants.  Petitioner points to the fact that Varnado initially failed to identify him

to police.  Further, petitioner argues that Varnado's identification of him is belied by the

fact that "all she could see was [sic] his eyes and his nose at a time when her own eyes were suffering the debility of hav[ing] [had] pepper spray recently rubbed in them."[22]

When conducting a post-AEDPA sufficiency of the evidence review, a federal court may grant relief only if it determines that the state court decision rested on an "unreasonable application" of clearly established Federal law, as determined by the Supreme Court, to the facts of the case. *See* 28 U.S.C. § 2254 (d)(1). In its analysis of petitioner's insufficiency of evidence claim, the Louisiana Fourth Circuit Court of Appeal first set forth the applicable Supreme Court law, along with corresponding state law, stating:

> In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Green,* 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. *State v. Mussall,* 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. *Mussall; Green; supra.* "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." *State v. Smith,* 600 So.2d 1319 (La.1992) at 1324.

---

[22] *See* Federal rec., doc. 1-3 at p. 25.

In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *State v. Shapiro,* 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from *Jackson v. Virginia, supra,* but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. *State v. Wright,* 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the *Jackson* reasonable doubt standard. [Citation omitted.]

*Price*, 842 So.2d at 505-506.

The court then examined the evidence submitted at trial regarding the

identification of petitioner, along with his co-defendant, David Honore, as the persons

who shot and killed the victim, Rickey Thomas.

Although Varnado first told police that she did not know who killed the victim, she later positively identified Honore and his good friend Price from their physical characteristics. It was undisputed that Felicia Varnado and Honore had known each other for many years, and had dated each other for approximately six and one-half years, from the time she was thirteen until she was nineteen. It is undisputed that Varnado was well acquainted with Price-she said she had known him since he was six or seven. Thus, it is beyond dispute that Varnado was familiar with each defendant's physical characteristics. According to Varnado, Honore had threatened to kill her and Rickey Thomas, whom he knew she was dating. Honore was not happy she was dating Thomas. Also, according to Varnado, Price had told her that if Honore ever caught her with another man Honore would kill her and the man....

Felicia Varnado did not positively identify defendants when she gave her first statement to police. However, she mentioned that one might be "Tully," a friend of the other perpetrator. Tully is defendant Price, who is defendant Honore's friend. Varnado explained her failure to affirmatively

identify defendants to Sgt. McNabb when giving that first statement by saying that she was afraid.  Honore presented the testimony of his brother that he was in Tennessee working until 5:30 p.m. on the day before the early morning murder.  Varnado even testified that Honore had been living in Tennessee at some point in 1999.  No one placed Honore in New Orleans on the day of the murder, or the day before the murder, except Felicia Varnado.  Two of Price's friends testified he was with them at the time of the murder, and immediately preceding and following it.  Other testimony put Price at Michael Rhea's home hours after the murder.  An empty shotgun shell box was found near Price's Lizardi Street residence.  It was the same brand and type of shotgun shells as the shotgun shell found at the scene of the murder.

*Price*, 842 So.2d at 506-507.

Thereafter, the Louisiana Fourth Circuit concluded:

Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found Felicia Varnado's testimony credible, rejected the alibi testimony of defense witnesses, resolved discrepancies in the testimony and evidence against defendants, and found beyond a reasonable doubt that David Honore ... [and] Uralle "Tully" Price shot the victim.

*Price*, 842 So.2d at 507.

This court finds that the above conclusion does not represent an unreasonable application of the law enunciated in *Jackson*, *supra*, to the facts of this case.

Accordingly, petitioner's claim for habeas corpus relief is without merit.

### F.  Claim 6): Favorable Evidence Unconstitutionally Withheld from Defense

Petitioner claims that the State unconstitutionally withheld favorable evidence when it "failed to turn over to the defense evidence of fingerprints found inside

54

of the vehicle and on the shotgun shell box that did not match that of the petitioner or his co-defendant."[23]  As the state appellate court explained:

> [I]t was discovered that Felicia Varnado's vehicle had been processed for fingerprints during direct and cross-examination of Dave Levy, of the Jefferson Parish Sheriff's Office, and St. Bernard Parish Sheriff's Office Detective Graf.  Levy assisted Det. Graf with the processing of the interior of Varnado's vehicle for fingerprints.  Levy testified that there may have been some non-identifiable fingerprints or smudges, but he understood that there were no positive matches to either of the defendants.  Det. Graf replied in the negative when asked on direct examination whether he found any fingerprint evidence on the inside of the vehicle, even a partial print or Felicia Varnado's fingerprints.  Det. Graf confirmed this on cross-examination.  He also confirmed that he dusted the exterior for fingerprints but again found none, not even a partial print.  A cigarette pack and a shotgun shell casing were also checked for prints, but none were found.

*Price*, 842 So.2d at 509.

In addressing petitioner's claim that the State unconstitutionally failed to disclose the fact that no match for his fingerprints were found, the Louisiana Fourth Circuit examined applicable federal law, along with corresponding state law.

> In *State v. Lindsey,* 98-1064 (La.App. 4 Cir. 6/3/98), 715 So.2d 544, this court set forth the applicable law pertaining to the State's disclosure of exculpatory evidence, or *Brady* material, as follows:
> The due process clause of the Fourteenth Amendment to the United States Constitution requires the disclosure upon request of evidence which is favorable to the accused when the evidence is material to guilt or punishment.  *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  This rule has been expanded to include evidence which

---

[23]*See* Federal rec., doc. 1-3 at pp. 26-27.

impeaches the testimony of a witness where the reliability or credibility of
the witness may be determinative of guilt or innocence.  *Giglio v. U.S.,* 405
U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The *Brady* rule is based on
due process of law.  "[T]he prosecutor is not required to deliver his entire
file to defense counsel, but only to disclose evidence favorable to the
accused that, if suppressed, would deprive the defendant of a fair trial, that
is, evidence favorable to the defendant which is material to guilt or
punishment."  *State v. Rosiere,* 488 So.2d 965, 970 (La.1986).  The test for
determining materiality was first established in *United States v. Bagley,* 473
U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).  However, in *Kyles v.
Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the
Supreme Court recently outlined the considerations for determining whether
allegedly-suppressed evidence is material.  These considerations were
summarized in a recent decision by the Louisiana Supreme Court, *State v.
Marshall,* 94-0461 (La.9/5/95), 660 So.2d 819:

The issue is whether the exculpatory evidence is material under the *Brady-
Bagley-Kyles* line of cases.  Evidence is material only if it is reasonably
probable that the result of the proceeding would have been different had the
evidence been disclosed to the defense.  A reasonable probability is one
which is sufficient to undermine confidence in the outcome.  [*United States
v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481
(1985)].  [The reviewing court] must provide a cumulative evaluation of the
suppressed evidence, keeping in mind that [the defendant] does not have to
show that, with the addition of the suppressed  evidence, his trial would
have resulted in acquittal or that there would be an insufficiency of the
evidence to support a conviction.  [The defendant] need only show that
"disclosure of the suppressed evidence to competent counsel would have
made a different result reasonably probable." *Kyles,* 115 S.Ct. at 1569.

In *State v. Cook,* 535 So.2d 988 (La.App. 4 Cir.1988), the defendant,
convicted of four counts of armed robbery, appealed citing an alleged *Brady*
violation.  He claimed that the State failed to disclose evidence that police
found fingerprints on the getaway vehicle allegedly used by him and two
others that did not match his prints.  This court noted that such evidence
may be material to a defendant's guilt.  However, this court held that, as the
evidence had been given to the jury during trial, the defendant received any
exculpatory benefit of that evidence.  Accordingly, this court found that the
case involved "a matter of late disclosure of evidence instead of a *Brady*
question of suppression of favorable evidence." 535 So.2d at 990.  The
defendant argued that he was prejudiced because had he known of the

56

evidence he might have chosen to subpoena one of his alleged accomplices, who had pleaded guilty, to testify at his trial.  This court rejected that argument, finding that the late disclosure of the fingerprint evidence did not prejudice the defendant or deny his right to a fair trial.

In *State v. Taylor,* 422 So.2d 109 (La.1982), the defendant was found guilty of first degree murder and sentenced to death.  The defendant appealed alleging a *Brady* violation because the State destroyed some fingerprints lifted from the victim's car.  Testimony established that the prints were discarded/destroyed because they did not contain enough points for identification. One of three good fingerprints recovered matched the defendant.  Noting that all fingerprints suitable for identification had been turned over to the defendant, the court found no *Brady* violation, stating: "The fingerprint technician merely threw away prints which were of no value, either as exculpatory or inculpatory evidence, because they contained insufficient points for identification purposes." 422 So.2d at 114.

*Price*, 842 So.2d at 509-510 (citations omitted).

Applying the above law to the pertinent facts, the court reasoned:

In the instant case, as in *Cook* and *Taylor,* there was no *Brady* violation. As in *Cook,* the case is one of late disclosure of evidence. Defendant Price attempted to call Dave Levy and Det. Graf at the motion for new trial, apparently to determine whether in fact no fingerprints were recovered from Felicia Varnado's vehicle; only partial prints not suitable for identification; or full prints that did not match defendants or any other known person.  The record of the hearing on the motion for new trial reflects that Dave Levy and Det. Graf were both present at the hearing.  The trial court refused to permit them to testify.

As noted, Det. Graf testified at trial that no fingerprints, even partial ones, were recovered from the car.  Dave Levy recalled that there might have been some "non-identifiable" prints or "smudges" found.  Thus, there is a discrepancy. However, even assuming Dave Levy's testimony was correct, his use of the terms "non-identifiable" and "smudges" could mean prints not suitable for identification purposes, as in *Taylor.*  Further, this discrepancy was brought out during the trial, during cross examination; defense counsel had an opportunity to resolve it then with minimal further

57

questioning, but failed to do so.  Finally, it can be noted that the late-disclosed evidence in *Cook* consisted of fingerprints suitable for identification that simply did not match those of the defendant.  Even assuming fingerprints suitable for identification were found on Felicia Varnado's vehicle, there is no suggestion that they were matched to anyone else, and thus the instant case is analogous to *Cook.*  Therefore, even if fingerprints suitable for identification were found, the instant case demands the same result as in *Cook.*

Defendants fail to allege any specific prejudice, but simply make a conclusory allegation that the belated disclosure prevented them from "preparing and using the evidence effectively." Under these circumstances, the trial court did not err in denying defendant's motion for new trial based on the late disclosure of this evidence. It cannot be said that defendants were denied their right to a fair trial due the late disclosure of this evidence.

*Price*, 842 So.2d at 510-511.

This court finds that the above reasoning on the part of the state appellate court does not represent an unreasonable application of Supreme Court law to the facts of this case.  Accordingly, petitioner's claim for habeas corpus relief is without merit.

### G.  Claim 7): Trial Court Erred in Sending Toxicology Report to Jury

During deliberations, the jury requested "Felicia Varnado's testimony, her statement, and 'all evidence that was admitted.'  The court indicated that it would send in the toxicology report."  *Price*, 842 So.2d at 514.  Petitioner claims that the trial court's decision in this regard "is contrary to and involves an unreasonable application [of] clearly established law as set forth by the United States Supreme Court."[24]  Petitioner,

---

[24]*See* Federal rec., doc. 12 at pp. 13-14.

however, fails to specify which United States Supreme Court decision the trial court runs afoul of with respect to its evidentiary decision regarding the admission of the toxicology report into the jury deliberation room.  As this court noted earlier, federal courts possess only limited authority to consider state evidentiary determination in state prisoner habeas proceedings.  *See Burgett*, *supra*.  Generally, as long as such a ruling infringes no constitutionally protected right, habeas relief is not warranted.  In light of the fact that petitioner has identified no constitutionally protected right, nor has this court's research uncovered any such right, which the above-referenced state court ruling infringed upon, petitioner's instant claim for habeas corpus relief is without merit.

Accordingly;

## **RECOMMENDATION**

It is hereby **RECOMMENDED** that the petition of Uralle Price for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v.*

*United Services Auto. Ass'n*, 79 F. 3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this  30th  day of ____May____, 2008.


_____
LOUIS MOORE, JR.
UNITED STATES MAGISTRATE JUDGE